## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| EPIQ CORPORATE RESTRUCTURING, LLC <br><br>                Plaintiff, <br><br>     v. <br><br> GREAT NORTHERN INSURANCE COMPANY and FEDERAL INSURANCE COMPANY, <br><br>                Defendants. |

Civil Action No. _____

## COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT, BAD FAITH INSURANCE PRACTICES, AND ATTORNEYS' FEES

Plaintiff Epiq Corporate Restructuring, LLC ("Epiq"), as and for its Complaint against Defendants Great Northern Insurance Company ("Great Northern") and Federal Insurance Company ("Federal," together with Great Northern, "Chubb"), alleges the following:

## NATURE OF THE ACTION

1.  This insurance coverage action arises out of Chubb's wrongful refusal to reimburse Epiq in full for the settlement of and pay Epiq's defense costs incurred in an underlying class action alleging claims of bodily injury under primary and excess general liability insurance policies sold by Chubb.

2.  The underlying class action, captioned *John Doe, et al. v. Epiq Corporate Restructuring, LLC* (the "Underlying Action"), was filed on February 8, 2023 in the U.S. District Court for the District of Connecticut under case number 3:23-cv-00154.

3.  The plaintiffs in the Underlying Action were abuse claimants who filed claims in the Chapter 11 bankruptcy of the Norwich Roman Catholic Diocese Corporation.  The plaintiffs alleged that an Epiq employee inadvertently released the confidential names and addresses of the abuse claimants who filed claims in the bankruptcy and who wished to remain anonymous.  The

plaintiffs further alleged that, as a result of the employee's unintentional disclosure, the plaintiffs

sustained bodily injuries, including physical sickness and disease, distress, shame, trauma, and

bodily harm.  Epiq faced substantial liability in the Underlying Action, including potentially

catastrophic compensatory damages plus attorneys' fees and costs and enormous potential

defense expenses (payable in addition to the limits of the Chubb policies).

4.       The allegations in the Underlying Action fall squarely within Chubb's promise to

defend and indemnify Epiq against any "suit" alleging "bodily injury," including resulting

"humiliation, mental anguish, mental injury or shock at any time."

5.       On February 9, 2023, Epiq provided notice of the Underlying Action to Chubb.

Chubb failed to timely respond.  Epiq protected its own interests (and Chubb's interests) and

engaged competent, experienced defense counsel.

6.       After deliberately delaying for over four months, Chubb finally acknowledged

that the Underlying Action triggered coverage under both the primary and excess general

liability policies.  Chubb agreed to pay Epiq's defense costs in the Underlying Action and

affirmatively recognized Epiq's right to choose its own counsel.  Chubb did not object to defense

counsel's rates.

7.       Subsequently, in the Underlying Action, the court ordered the parties to attend

mediation and required Epiq's insurance companies to attend with full authority to settle.

8.       Despite that court order, Chubb refused to authorize full settlement authority up to

the limits of the Chubb policies, and instead only acknowledged that it would attend the

mediation with settlement authority of a negligible amount.

9.       At the mediation, after continued delay and bad faith conduct by Chubb that

jeopardized the resolution of the matter, Chubb ultimately agreed to fund the settlement of the

Underlying Action.  Non-party AIG Specialty Insurance Company ("AIG") – which sold a separate insurance policy to Epiq (the "AIG Policy") – also agreed to contribute to the settlement.

10.    The Underlying Action settled for $50,000 to each of the 129 settlement class members and $75,000 to each of the two lead plaintiffs (totaling $6.6 million).  Chubb and AIG agreed between themselves without Epiq's agreement to fund the settlement 50/50, and Epiq reserved all its rights regarding allocation of the settlement amount.  AIG paid a share towards the settlement above the $2.5 million retention in the AIG Policy.  Chubb paid a 50% share of the total settlement.  Epiq requested $2.5 million that Epiq was forced to pay itself by Chubb's breach from Chubb as its primary insurance company.  Chubb refused to pay the amount and instead left Epiq paying $2.5 million of the settlement.

11.    Chubb's position is not supported by any policy language or the law.  Where coverage is triggered under more than one policy, Epiq has the right to choose to tender its claim to one insurance company even though another insurance company might provide coverage for a loss.  This is so because "[e]ach insurer undertook contractual responsibility to cover the entire loss, and each received consideration for doing so.  An insurer that expressly agreed to cover an entire loss is not harmed by being obliged to do so." *Mut. of Enumclaw Ins. Co. v. USF Ins. Co*., 191 P.3d 866, 874 (Wash. 2008); *see also Alcan United, Inc. v. West Bend Mut. Ins. Co*., 707 N.E.2d 687, 691 (Ill. App. Ct. 1999); 13 New Appleman on Insurance Law Library Edition § 166.06(1).  Chubb's failure to fund the remainder of the settlement constitutes a breach of contract.

12.    In addition, despite expressly agreeing to pay Epiq's defense costs with no objection to defense counsel's rates, Chubb later asserted that it would only pay Epiq's defense

costs at reduced rates based on the rates that were negotiated solely between AIG and Epiq's defense counsel, DLA Piper, at the start of the Underlying Action.  However, Chubb was not a party to this agreement between AIG and DLA Piper and did not negotiate its own separate rates with defense counsel.

13.     Chubb's actions constitute a breach of Chubb's contractual and other obligations to Epiq, including Chubb's duty of good faith and fair dealing that it owes Epiq.

14.     Chubb has no valid basis for refusing further payment to Epiq under the Chubb policies.

15.     Accordingly, Epiq brings this action seeking damages from Chubb for the outstanding settlement amount and defense expenses that Chubb wrongful refuses to pay in full, including interest and extracontractual damages for Chubb's bad faith claims handling practices.

## THE PARTIES

16.     Plaintiff Epiq is a limited liability company organized and existing under the laws of New York.  The members of Epiq are citizens of New York, Missouri, Georgia, and Delaware.  Thus, Epiq is a citizen of New York, Missouri, Georgia, and Delaware.

17.     Upon information and belief, Defendant Great Northern is a corporation incorporated under the laws of Indiana with its principal place of business in Pennsylvania. Great Northern transacts business throughout the United States, including in Connecticut.

18.     Upon information and belief, Defendant Federal is a corporation incorporated under the laws of Indiana with its principal place of business in New Jersey.  Federal transacts business throughout the United States, including in Connecticut.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332 because there is complete diversity of citizenship between the parties and the amount in

controversy exceeds $75,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over all parties to this action pursuant to

Conn. Gen. Stat. § 52-59b because Chubb transacted business in the State of Connecticut and

contracted to provide insurance policies from which this action arises in the State of Connecticut.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial

part of the events or omissions giving rise to the claims occurred in this District and a substantial

part of the property that is the subject of this action is situated in this District.

## FACTUAL BACKGROUND

### The Chubb General Liability Policies

22.     DTI Topco. Inc. ("DTI"), Epiq's ultimate parent company, purchased a multi-

layered general liability insurance program from Chubb covering the policy period from

September 1, 2022 to September 1, 2023.  Epiq is a Named Insured under the insurance program.

A copy of the Primary Policy is attached as **Exhibit A**.  *See* Ex. A, Primary Policy at

EPIQ000001.

23.     Great Northern sold the first layer of the insurance program constituting the

primary policy, Customarq Classic General Liability Insurance Policy, Policy No. 3605-41-67

MIN, for the policy period of September 1, 2022 to September 1, 2023, with limits of $1,000,000

(the "Primary Policy").  *See* Ex. A, Primary Policy at EPIQ000197.

24.     Federal sold the excess and umbrella policy, Commercial Umbrella and Excess

Insurance Policy, Policy No. 7989-67-04, for the policy period of September 1, 2022 to

September 1, 2023, with limits of $50,000,000 (the "Excess Policy").  A copy of the Excess

Policy is attached as **Exhibit B**.  *See* Ex. B, Excess Policy at EPIQ000410.

25.     The Excess Policy "follows form" to the Primary Policy (collectively, the "Chubb

Policies"), which means that it incorporates by reference the terms and conditions of the Primary

Policy.  *See* Ex. B, Excess Policy at EPIQ000466.

26.     Epiq and DTI have complied with all the terms and conditions of the Chubb

Policies.  DTI has paid all the premiums due to Chubb for the Chubb Policies.

27.     The Primary Policy provides:

> [Great Northern] will pay damages that the **insured** becomes
> legally obligated to pay by reason of liability:
>
> - imposed by law; or
>
> - assumed in an **insured contract**;
>
> for **bodily injury** or **property damage** caused by an occurrence to
> which this coverage applies.
>
> This coverage applies only to such **bodily injury** or **property
> damage** that occurs during the policy period.
>
> Damages for **bodily injury** include damages claimed by a person
> or organization for care or loss of services resulting at any time
> from the **bodily injury**.

                                   ***

*See* Ex. A, Primary Policy at EPIQ000241.

28.     Occurrence is defined as "an accident, including continuous or repeated exposure

to substantially the same general harmful conditions."  Ex. A, Primary Policy at EPIQ000267.

29.     Under the Primary Policy, bodily injury is defined as

> **Bodily injury** means physical:
>
> - injury;
>
> - sickness; or

- disease;

sustained by a person, including resulting death, *humiliation,
mental anguish, mental injury or shock at any time*.   All such loss
shall be deemed to occur at the time of the physical injury,
sickness or disease that caused it.

*See* Ex. A, Primary Policy at EPIQ000263 (emphasis added).

30.     The Excess Policy includes a Coverage/Excess Follow-Form Coverage A

provision ("Coverage A of the Excess Policy").  *See* Ex. B.

31.     Coverage A of the Excess Policy "follows-form" to the terms of the Primary

Policy.  *See* Ex. B, Excess Policy at EPIQ000464.

32.     Specifically, Coverage A of the Excess Policy provides that "[t]his coverage will

follow the terms and conditions of **underlying insurance** described in the Schedule of

Underlying Insurance[.]"  *See* Ex. B, Excess Policy at EPIQ000422.  The Schedule of

Underlying Insurance lists the Primary Policy sold by Great Northern.  *See* Ex. B, Excess Policy

at EPIQ000412.

33.     Coverage A of the Excess Policy provides that "[Federal] will pay, on behalf of

[Epiq], that part of the loss to which this coverage applies, which exceeds the applicable

**underlying limits**."  *See* Ex. B, Excess Policy at EPIQ000422.

34.     Under the Excess Policy, "**[u]nderlying limits** means the sum of amounts:

A. shown for the hazards described in the Schedule Of Underlying
Insurance, consisting of amounts:

1. available under applicable **underlying insurance;** and

2. any **insured** must pay because **underlying insurance,** as
represented by you, is not available, regardless of the
reason;

B. available under any applicable antecedent, renewal or
replacement of **underlying insurance;**

7

> C. of any allocation, deductible, participation, retention or other self-insurance applicable to the insurance described in paragraphs A. and B. above; and
>
> D. any reinstatement of limits or supplemental or other limits available under the insurance described in paragraphs A. and B. above.

*See* Ex. B, Excess Policy at EPIQ000450**.**

35.     Under the Excess Policy, Coverage A of the Excess Policy covers any liability or

loss, cost or expense arising out of:

> A. physical:
>
> > 1. injury;
> >
> > 2. sickness; or
> >
> > 3. disease
>
> Sustained by a person, including resulting death, *humiliation, mental anguish, mental injury or shock at any time*.   All such loss shall be deemed to occur at the time of the physical injury, sickness or disease that caused it.
>
> ***

*See* Ex. B, Excess Policy at EPIQ000493 (emphasis added).

36.     Losses arising out of the Underlying Action exceed the applicable underlying

limits of the Primary Policy.

37.     The Chubb Policies do not include a retention.

**<u>The Underlying Proceeding</u>**

38.     On February 9, 2023, Epiq timely provided notice to Chubb of the class action

complaint filed against Epiq on February 8, 2023 in the United States District Court for the

District of Connecticut, captioned *John Doe, et al. v. Epiq Corporate Restructuring, LLC*, Case

8

No. 3:23-cv-00154 (the "Underlying Complaint").  A copy of the Underlying Complaint is attached as **Exhibit C**.

39.     The Underlying Complaint alleges that an Epiq employee (the "Employee") inadvertently released the names and addresses of certain sexual abuse claimants that sought to remain anonymous onto the website and docket of the Chapter 11 bankruptcy proceeding of the Norwich Roman Catholic Diocesan Corporation.  *See, e.g.,* Ex. C, Compl. ¶¶ 28, 33-34, 39-40, 46-49, 55, 57, 64, 71, 80.

40.     The plaintiffs alleged that, as a result of the Employee's unintentional disclosure of the information, the plaintiffs sustained bodily injuries, including emotional and physical distress, shame, trauma, and bodily harm.  *Id.*

41.     The Employee's unintentional release of the names and addresses of the claimants was an "accident" and constitutes an "**occurrence**" under the Chubb Policies.

42.     Specifically, the Underlying Complaint alleges that "the Plaintiffs, and all class members, have been and may be required in the future to obtain professional mental health counseling and treatment, as well as treatment for *physical injuries*, due to the trauma of public disclosure of their identities as sexual abuse survivors…"  Ex. C, Compl. ¶¶ 28, 34, 40, 49, 57, 64 (emphasis added); *see also id.* ¶¶ 33, 39, 48, 71, 80 (alleging "physical distress"); *id.* ¶ 46 (alleging "illness and bodily injury").

43.     The Underlying Complaint alleges that:

> the Plaintiffs, and all class members, *sustained severe and permanent injuries*, including having their names publicly disclosed and/or available for public view.  The Plaintiffs, and all class members, now live in fear that members of the public, including co-workers, friends, family and acquaintances, are aware that they were sexually abused when they were children, and *this fear has created and will in the future create great emotional and physical distress*.  The Plaintiffs, and many class members, have told very few others in their lives about the fact that they were

> sexually abused when they were children and this public disclosure
> has *caused them to feel additional shame and trauma*.

Ex. C, Compl. ¶¶ 33, 39, 48, 71, 80 (emphasis added).

44.     The Underlying Complaint further alleges that "the emotional distress suffered by the Plaintiffs, and all class members, was and is severe enough that it *has and will result in illness and bodily harm*." Ex. C, Compl. ¶ 46 (emphasis added).

45.     Additionally, the Underlying Complaint alleges damages for bodily injury and harm which resulted in physical and emotional distress, humiliation, mental anguish, mental injury or shock.

46.     Moreover, at Chubb's request, Epiq provided Chubb with extensive catalogued charts prepared by the underlying plaintiffs' counsel detailing distinct allegations of physical and mental injuries suffered by over sixty plaintiffs in the Underlying Action (the "Bodily Injury Chart"). The Bodily Injury Chart set forth allegations of physical injury, sickness and disease.

47.     The Employee's actions giving rise to the occurrence did not involve specialized knowledge, labor or skill, nor were the actions of the Employee predominantly mental or intellectual. Rather, the Employee's actions giving rise to the occurrence were physical or manual in nature and do not constitute professional services.

48.     The Underlying Complaint does not allege damages arising out of the rendering of or failure to render any professional services.

49.     In sum, the Underlying Action deals with precisely the type of damages for bodily injury that are covered under the terms of the Chubb Primary Policy and Coverage A of the Excess Policy – physical injury, sickness or disease including humiliation, mental anguish, mental injury and shock, including shame, trauma, and emotional and physical distress.

50.     Accordingly, the allegations in the Underlying Complaint trigger coverage for the Underlying Action under the Primary Policy and Excess Policy.

51.     The Underlying Action does not fall under any exclusion in the Chubb Policies.

### Chubb Delays in Responding to Epiq's Tender of the Underlying Action But Acknowledges That Coverage Is Triggered Under the Chubb Policies

52.     Although Epiq provided timely notice of the Underlying Action to Chubb on February 9, 2023, Chubb failed to issue its coverage position until May 5, 2023.

53.     At the time of providing notice, Epiq stressed the time sensitivity of the matter given the substantial liability at stake.  Epiq protected both its own (and Chubb's) best interests and engaged competent, experienced defense counsel, DLA Piper (lead defense counsel) and Cummings & Lockwood (local counsel), in the Underlying Action.

54.     On May 5, 2023, three months after receiving notice of the Underlying Action, Chubb issued its initial coverage position (the "Initial Coverage Position").  A copy of the Initial Coverage Position is attached as **Exhibit D**.

55.     The Initial Coverage Position correctly acknowledged that coverage was triggered by the Underlying Action under the Primary Policy yet erroneously denied coverage under the Excess Policy.

56.     Specifically, the Initial Coverage Position acknowledged that the "Plaintiffs allege[d] to have sustained mental injuries which have or may result in illness or bodily harm" (Ex. D at 3, 8) and that "Plaintiffs have been and may be required in the future to obtain professional mental health counseling and treatment, as well as treatment for physical injuries" (*id.* at 2).

57.     On June 13, 2023, more than four months after receiving notice of the Underlying Action, Chubb reissued its coverage position (the "Revised Coverage Position").  A copy of the

Revised Coverage Position is attached as **Exhibit E**.  In the Revised Coverage Position, Chubb again acknowledged that the Underlying Action triggered coverage under the Primary Policy and agreed to defend Epiq subject to a reservation of rights.  Chubb additionally corrected its erroneous denial of coverage under the Excess Policy in the Initial Coverage Position and acknowledged that coverage may be owed under Coverage A of the Excess Policy upon exhaustion of the limits of the Primary Policy.   Chubb provided no explanation for its initial erroneous position.

58.      Chubb agreed that it is a primary insurance company and responsible for Epiq's defense expenses incurred in the Underlying Action.

59.      Chubb was fully aware that DLA Piper was acting as Epiq's defense counsel in the Underlying Action.  Chubb communicated directly with defense counsel regarding the Underlying Action numerous times including, but not limited to, on March 14, 2023, March 20, 2023, March 29, 2023, March 31, 2023, April 4, 2023, April 6, 2023, April 11, 2023, April 14, 2023, April 18, 2023, May 1, 2023, May 25, 2023, and June 8, 2023.

60.      On July 3, 2023, defense counsel submitted the first batch of invoices to Chubb. Chubb acknowledged receipt of the invoices and did not object to the rates.

61.      Chubb did not object to the rates of DLA Piper at any time before the settlement of the Underlying Action.

62.      To date, DLA Piper's defense costs and expenses for the Underlying Action remain unpaid.

**Chubb's Continued Bad Faith Claims Handling
in the Mediation and Settlement of the Underlying Action**

63.     On June 5, 2023, the United States District Court for the District of Connecticut ordered Chubb to attend mediation on July 13, 2023 (the "Mediation") with "full authority to settle the case" (the "Court Order").  A copy of the June 5, 2023 Order is attached as **Exhibit F**.

64.     Despite acknowledging its coverage obligations, Chubb refused to authorize settlement authority within the limits of the Chubb Policies.

65.     By letter dated June 27, 2023, Epiq demanded that Chubb immediately authorize settlement authority in advance of the Mediation.  Epiq advised Chubb of the significant potential liability Epiq faced if Chubb failed to participate in the Mediation.

66.     On July 6, 2023, in response to Chubb's request for additional information related to the underlying plaintiffs' allegations of bodily injury, DLA Piper provided Chubb with the Bodily Injury Chart detailing distinct allegations of physical injuries and sickness suffered by over sixty plaintiffs in the Underlying Action.

67.     Upon receipt of the Bodily Injury Chart, claims executives at other insurance companies, including from another Chubb company, urged Chubb to provide an updated indemnity coverage position "[n]ow that we have this more particularized description of the claimed injuries."  Chubb refused to update its indemnity position or provide full settlement authority.  Similarly, Epiq's excess cyber risk insurance company, AXA XL, threatened to seek reimbursement from Chubb in the event Chubb failed to make an appropriate contribution to the settlement and, AXA XL was obligated to step in and pay on the back end.

68.     Chubb did not respond to the June 27, 2023 letter until July 13, 2023 – the date of the Mediation – stating that Chubb would attend the Mediation with authority of a negligible

amount.   Chubb refused to increase its settlement authority above $200,000 despite tons of millions in potential liability for defense and indemnity.

69.     Subsequently, at the Mediation, Chubb's conduct was uncooperative, prejudicial to Epiq's defense, and threatened the appropriate resolution of the case.  Chubb's improper conduct was recognized by Epiq, AIG, the Judge and other parties.

70.     The Underlying Action settled for $50,000 to each of the 129 settlement class members and $75,000 to each of the two lead plaintiffs (totaling $6.6 million) (the "Settlement").

71.     Chubb and AIG agreed between themselves without Epiq's agreement to fund the settlement 50/50, and Epiq reserved all its rights regarding allocation of the settlement amount.  AIG paid a share towards the settlement above the $2.5 million retention in the AIG Policy.  Chubb paid a 50% share of the total settlement.  Epiq requested $2.5 million that Epiq was forced to pay itself by Chubb's breach from Chubb as its primary insurance company.  Chubb refused to pay the amount and instead left Epiq paying $2.5 million of the settlement.

72.     Chubb acted in willful disregard of the Court-ordered Settlement payment deadlines and in a manner contrary to Epiq's interests.

73.     By letter dated October 19, 2023, Epiq demanded that Chubb explain its basis for refusing to pay the additional $2.5 million of the Settlement.  Chubb did not respond.

74.     In an email dated December 4, 2023, five months after Chubb agreed at the Mediation to fund the Settlement, Chubb advised Epiq that "Chubb [is] not promising a wire payment by a date certain" despite the Court Order requiring payment of Settlement amounts by December 11, 2023.  Chubb also asserted that it would not pay the remaining $2.5 million towards the Settlement.

75.     On December 11, 2023, Chubb paid a limited sum towards the Settlement but continued to refuse to pay the remaining $2.5 million that Chubb is obligated pay under the Chubb Policies, leaving Epiq with a $2.5 million shortfall.

76.     On December 11, 2023, Epiq again requested that Chubb pay the remaining $2.5 million of the Settlement.

77.     By letter dated letter January 16, 2024, Chubb finally responded to Epiq's October 19, 2023 and December 11, 2023 letters, and reiterated that it would not reimburse Epiq for the additional $2.5 million of the Settlement.   Chubb provided no legal basis for its position. Chubb did, however, expressly acknowledge that the Chubb Policies provide "primary" coverage for general liability to Epiq and that the Chubb Policies cover a separate loss from the AIG Policy.

78.     Chubb did not enter any agreement with Epiq limiting its indemnification obligations for the Settlement.  Rather, Epiq expressly reserved its rights to seek reimbursement of the additional $2.5 million of the Settlement at Mediation and prior to Chubb's payment towards the Settlement.

79.     Even though both Chubb and AIG agreed to contribute to the Settlement, Epiq has the right to demand payment from just one insurance company when coverage is triggered under multiple policies, even though another insurance company also covers the loss.  That is so because each insurance company took contractual responsibility to cover the entire loss, and each received consideration for doing so.  An insurance company that expressly agreed to cover the entire loss is not harmed by being obliged to do so.  *See, e.g., Mut. of Enumclaw Ins. Co.*, 191 P.3d at 874; *Alcan United, Inc.*, 707 N.E.2d at 691.

80. Moreover, the Chubb Policies cover a separate type of loss from the AIG Policy, for which Chubb is obligated to insure on a primary basis.

81. Because the Chubb Policies cover the Underlying Action, Chubb must reimburse Epiq for the remaining $2.5 million of the Settlement.

**<u>Chubb Refuses to Pay Epiq's Defense Costs</u>**

82. Despite expressly agreeing to pay Epiq's defense costs and acknowledging DLA Piper's role as defense counsel without objecting to DLA Piper's full rates, Chubb also refuses to pay DLA Piper's defense costs at the actual rates of defense counsel.

83. On October 19, 2023 and December 11, 2023, Epiq also demanded that Chubb explain its basis for refusing to reimburse Epiq for defense costs at DLA Piper's actual rates. Chubb failed to acknowledge its full defense obligations in its January 16, 2024 letter. Chubb did not provide any legal support for its position.

84. AIG and DLA Piper separately negotiated and agreed to the rates AIG would pay for defense counsel in the Underlying Action (the "AIG Defense Agreement"). Chubb was not a party to the AIG Defense Agreement, nor an intended beneficiary.

85. Chubb did not negotiate any agreement with DLA Piper regarding rates.

86. Rather, Chubb acknowledged its defense obligations, and acknowledged DLA Piper's role as defense counsel, and never objected to the full rates of DLA Piper before the settlement of the Underlying Action.

87. Chubb asserts that the AIG Defense Agreement should apply to limit Chubb's obligations to pay Epiq's defense costs. However, Chubb was not a party to the AIG Defense Rate Agreement and, therefore, cannot receive the benefit of an agreement which it failed to make. Moreover, DLA Piper's rates are reasonable.

88.    As such, absent some agreement between Chubb and DLA Piper, which does not exist, Chubb cannot refuse to pay DLA Piper's regular defense rates.

89.    Chubb expressly agreed to pay Epiq's defense costs including on May 5, 2023 and June 13, 2023.

90.    DLA Piper has not been paid for its defense costs incurred in successfully defending the Underlying Action.

91.    Accordingly, Chubb must pay Epiq's defense costs at the full rates of DLA Piper totaling $1,755,301.90.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

92.    Epiq repeats and realleges each and every allegation set forth in Paragraphs 1 through 91, as if fully set forth herein.

93.    Pursuant to 28 U.S.C. § 2201, Epiq seeks declaratory judgment for the purpose of determining questions of actual controversy between the parties regarding the Chubb Policies.

94.    Epiq is a Named Insured under the Chubb Policies.

95.    The Underlying Action triggers Chubb's coverage obligations.

96.    Chubb breached its obligations under the Chubb Policies by failing to honor or by disputing its coverage obligations under the Chubb Policies with respect to the Underlying Action.

97.    Epiq is entitled to declaratory judgment by this Court of its rights and the obligations of Chubb under the Chubb Policies with respect to the Underlying Action.

98.    An actual and justiciable controversy has arisen between Epiq and Chubb as to the meaning and application of the Chubb Policies regarding: (1) whether Chubb must indemnify Epiq for the remaining $2.5 million of the Settlement of the Underlying Action under the Chubb

Policies; and (2) whether Chubb may assert that the rates negotiated in a separate agreement between AIG and DLA Piper to which it was not a party may apply to limit its obligations to reimburse Epiq for its Defense Costs under the Chubb Policies.

99.     By reason of the foregoing, an actual and justiciable controversy exists between Epiq and Chubb regarding Chubb's obligations to cover the unpaid amounts in the Underlying Action.

100.     Epiq seeks a judicial determination by this Court of Chubb's obligations to cover the amounts paid by Epiq for the Underlying Action.

101.     Such a judicial determination is necessary and appropriate at this time under the circumstances alleged.

## SECOND CAUSE OF ACTION

### (Breach of Contract – Defense Costs)

102.     Epiq repeats and realleges each and every allegation set forth in Paragraphs 1 through 101, as if fully set forth herein.

103.     Under the terms of the Chubb Policies, Chubb has a contractual obligation to reimburse Epiq or to pay defense counsel, DLA Piper, for reasonable Defense Costs.

104.     The rates charged by DLA Piper for the defense of the Underlying Action are reasonable.

105.     Chubb did not object to the rates of DLA Piper, nor did Chubb negotiate lower rates with DLA Piper.

106.     Notwithstanding this obligation, Chubb, by refusing to reimburse Epiq for the full rates charged by DLA Piper, has violated its obligation to Epiq and therefore breached the Chubb Primary Policy.

107.    Epiq and DTI Topco have satisfied all obligations currently owing under the Chubb Policies and have complied with all conditions necessary for coverage under the Chubb Policies.

108.    Chubb's breaches, action and conduct described above constitute a breach of contract.

109.    As a direct and proximate result of Chubb's breach of contract, Chubb is liable to Epiq for damages, the exact amount to be proven at trial, including, but not limited to, compensatory and consequential damages, attorneys' fees and costs, and pre- and post-judgment interest.

## THIRD CAUSE OF ACTION

### (Breach of Contract – Indemnification)

110.    Epiq repeats and realleges each and every allegation set forth in Paragraphs 1 through 109, as if fully set forth herein.

111.    Under the terms of the Chubb Policies, Chubb has a contractual obligation to indemnify Epiq for unpaid amounts in the Underlying Action.

112.    Notwithstanding this obligation, Chubb, by asserting that its indemnification obligations are limited, has violated its obligation to Epiq and therefore breached the Chubb Policies.

113.    Epiq and DTI Topco have satisfied all obligations currently owing under the Chubb Policies and have complied with all conditions necessary for coverage under the Chubb Policies.

114.    Chubb's breaches, action and conduct described above constitute a breach of contract.

115.    As a direct and proximate result of Chubb's breach of contract, Chubb is liable to Epiq for damages, the exact amount to be proven at trial, including, but not limited to, compensatory and consequential damages, attorneys' fees and costs, and pre- and post-judgment interest.

## FOURTH CAUSE OF ACTION

### (Common Law Bad Faith)

116.    Epiq repeats and realleges each and every allegation set forth in Paragraphs 1 through 115, as if fully set forth herein.

117.    As an insurance company, Chubb owes a duty of good faith and fair dealing to Epiq, a Named Insured under the Chubb Policies.

118.    Chubb has willfully and without reason failed and refused to pay remaining defense costs and settlement amounts, despite due demand.

119.    By refusing to pay, Chubb has placed its own interests before Epiq's interests. This violates the terms of the Chubb Policies.

120.    Additionally, Chubb's actions were negligent, careless, reckless, malicious and vindictive and violated the laws of the State of Connecticut and Chubb's obligations to act in good faith towards, and deal fairly with, Epiq.

121.    As a proximate result of Chubb's aforementioned wrongful conduct, Epiq suffered, and will continue to suffer in the future, damages plus interest in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Violation of CUTPA)

122.    Epiq repeats and realleges each and every allegation set forth in Paragraphs 1 through 121, as if fully set forth herein.

123.    C.G.S. § 42-110b provides that "(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

124.    Chubb is a "person" within the meaning of C.G.S. § 42-110b, *et seq*.

125.    At the time of the events described in this Complaint, Chubb was licensed and regulated by the State of Connecticut through its administrative agencies and subject to the statutes and regulations of the State of Connecticut.

126.    Upon information and belief, Chubb has delayed coverage decisions, wrongfully refused to provide coverage and manufactured improper and erroneous reasons for denying coverage to insureds in Connecticut and across the country with such frequency as to indicate a general business practice.

127.    Chubb violated CUTPA, by among other things, failing to provide coverage to Epiq as promised by engaging in continuous oppressive conduct which has caused substantial injury to Epiq's business interests.

128.    Chubb was acting in its line of insurance business when it violated CUTPA.

129.    Chubb's actions or inactions in handling claims under the Chubb Policies have been deceptive and violate public policy as part of a pattern and practice of improper conduct aimed at Epiq and similarly situated policyholder consumers.

130.    The foregoing actions by Chubb are wrongful, intentional, willful, wanton, immoral, oppressive, unscrupulous, and offend public policy.

131.    Epiq has suffered a substantial and ascertainable loss of money as a consequence of Chubb's unfair and/or deceptive actions.

132.    Chubb acted toward Epiq in conscious disregard of Plaintiff's rights, and with the intent to vex, injure, and annoy Epiq so as to constitute oppression, fraud and malice, thereby

justifying punitive and exemplary damages sufficient to punish Chubb and to deter such conduct in the future.

133.     Based on the above, Chubb has violated CUTPA and is liable to Epiq as a consequence.

### SIXTH CAUSE OF ACTION

### (Violation of CUIPA)

134.     Epiq repeats and realleges each and every allegation set forth in Paragraphs 1 through 133, as if fully set forth herein.

135.     CUIPA, C.G.S. § 38a-816, proscribes "unfair and deceptive acts or practices in the business of insurance" and provides, in pertinent part, that insurance companies must follow certain statutory requirements in their claims handling practices.

136.     Chubb is a "person" within the meaning of C.G.S. §§ 38a-815, *et seq*.

137.     At the time of the events described in this Complaint, Chubb was licensed and regulated by the State of Connecticut through its administrative agencies and subject to the statutes and regulations of the State of Connecticut.

138.     Chubb has violated CUIPA by engaging in a pattern and practice of "not attempting in good faith to effectuate prompt fair and equitable settlements of claims in which liability has become reasonably clear . . .", failing to implement reasonable standards for the prompt investigation of the claim, and refusing to pay claims without conducting a reasonable investigation based upon available information.  C.G.S. §§ 38a-816(6).

139.     The foregoing actions by Chubb are wrongful, intentional, willful, wanton, immoral, oppressive, unscrupulous, and offend public policy.

140.    Upon information and belief, Chubb has engaged in the wrongful conduct enumerated above in connection with Epiq's claim and the claims of other policyholders with such frequency as to constitute unfair insurance practices in violation of CUIPA.

141.    Chubb was acting in its line of insurance business when it violated CUIPA.

142.    Epiq suffered a substantial and ascertainable loss of money as a consequence of Chubb's unfair and/or deceptive actions, the exact amount to be proven at trial.

143.    Chubb's actions offend the public policies of the State of Connecticut enumerated in CUIPA.

144.    Chubb acted in conscious disregard of Epiq's rights, and with intent to vex, injure and annoy Epiq, so as to constitute oppression, fraud, and malice, thereby justifying punitive and exemplary damages sufficient to punish Chubb and to deter such conduct in the future.

145.    Based on the above, Chubb has violated CUIPA and is liable to the Epiq as a consequence.

WHEREFORE, Epiq demands judgment in its favor and against Chubb:

(1)    With respect to the First Cause of Action:

    a.    Declaring that Chubb must reimburse Epiq for the outstanding $2.5 million of the Settlement in the Underlying Action;

    b.    Declaring that Chubb must pay Epiq's defense costs at the full rates charged by defense counsel, DLA Piper;

    c.    Granting Epiq attorneys' fees, expenses, and costs incurred in this action; and

    d.    Granting Epiq such other and further relief as the Court may deem just and proper.

(2)    With Respect to the Second, Third, Fourth, Fifth and Sixth Causes of Action:

    a.    Awarding money damages, including but not limited to, compensatory and consequential damages, in an amount to be determined at trial,

pre-judgment and post-judgment interest, and attorneys' fees, expenses and costs incurred in this action; and

b.  Granting Epiq such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial as to all issues so triable.

Dated: March 27, 2024 **ANDERSON KILL P.C.**

By:  /s/ Daniel F. McGuire
_____

Daniel F. McGuire, Esq.
ANDERSON KILL P.C.
1055 Washington Boulevard, Suite 530
Stamford, Connecticut 06901
Tel.: (203) 388-7944
Email: dmcguire@andersonkill.com

William G. Passannante, Esq.*
Raymond A. Mascia, Jr., Esq.*
Regan E. Samson, Esq.*
ANDERSON KILL P.C.
1251 Avenue of the Americas
New York, New York 10128
Tel.: (212) 278-1000
Email: wpassannante@andersonkill.com
Email: rmascia@andersonkill.com
Email: rsamson@andersonkill.com

*pro hac vice applications to be filed

Attorneys for Plaintiff Epiq Corporate Restructuring, LLC